IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
WESTERN DIVISION


- - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                         :
      Plaintiff,         :
                         :
vs.                      :        Criminal No. 1:22-cr-57
                         :
ERNEST RAY ROBERTS, JR., :        TRANSCRIPT OF HEARING ON
                         :            MOTION TO SUPPRESS
      Defendant.         :
- - - - - - - - - - - - X        Volume 2




                         U.S. Courthouse
                         2146 27th Avenue
                         Council Bluffs, Iowa
                         Friday, March 3, 2023
                         11:33 a.m.


BEFORE:  THE HONORABLE HELEN C. ADAMS, Chief Magistrate Judge


APPEARANCES:

For the Plaintiff:        SHELLY M. SUDMANN, ESQ.
                          United States Attorney's Office
                          2146 27th Avenue, Suite 400
                          Council Bluffs, IA  51502-1887


For the Defendant:        MICHAEL F. MALONEY, ESQ.
                          Federal Public Defender's Office
                          701 Pierce Street, Suite 400
                          Sioux City, Iowa  51101



                   TONYA R. GERKE, CSR, RDR, CRR
                     United States Courthouse
                 123 East Walnut Street, Room 197
                     Des Moines, Iowa 50309

34

1                    P R O C E E D I N G S

2          THE COURT:  Please be seated.

3          We are here in the United States of America versus

4  Ernest Ray Roberts, Jr.  That's Case Number 1:22-cr-57.

5          Mr. Roberts is present here in the courtroom.  He's

6  here with Mr. Maloney from the Federal Public Defender's Office.

7  Ms. Sudmann is here on behalf of the Government.

8          We're here to continue a suppression hearing that we

9  had previously started.  Counsel asked the Court if they could

10 present some additional evidence, and the Court has kept the

11 record open for that purpose.

12         Ms. Sudmann, does the Government have additional

13 evidence it wants to present?

14         MS. SUDMANN:  Yes, Your Honor.

15         THE COURT:  Okay.  Why don't you go ahead and call

16 your first witness.

17         MS. SUDMANN:  Your Honor, the Government will call

18 Zach Foley.

19         THE COURT:  Mr. Foley, if you'll come up here.

20         If you stop in front of this lady here, she's going to

21 put you under oath, so come right on up in front of her.

22         THE CLERK:  Please raise your right hand.

23          ZACHARY FOLEY, GOVERNMENT WITNESS, SWORN

24         THE COURT:  Thank you.  You can go right up there and

25 sit in that chair, please.

1          THE WITNESS:  All right.

2          THE COURT:  Whenever you're ready, Ms. Sudmann.

3          MS. SUDMANN:  Thank you.

4                    DIRECT EXAMINATION

5    BY MS. SUDMANN:

6    Q.  Sir, please state your name and spell your last name for the

7    record.

8    A.  Zachary Foley, F-o-l-e-y.

9    Q.  What is your occupation, sir?

10   A.  Casino shift supervisor for Prairie Flower Casino.

11   Q.  And how long have you worked at Prairie Flower Casino?

12   A.  Just a little over three years.

13   Q.  And did you work last night?

14   A.  Yes.

15   Q.  And so what was your shift last night?

16   A.  11 p.m. to 7 a.m.

17   Q.  And where is Prairie Flower located?

18   A.  Carter Lake, Iowa.

19   Q.  And can you just kind of describe the casino?

20   A.  It's small.  It's quaint.  There's 209 slot machines, a bar,

21   a little restaurant-type thing they can order food from.

22   Q.  Is there -- how many entrances do guests have to come in and

23   out of the facility?

24   A.  There's only one entrance for guests.

25   Q.  As part of your job responsibilities with the Prairie Flower

36

1  Casino, do you often walk around the casino?

2  A.  Yes.

3  Q.  And about how long does it take you to walk around the

4  casino?

5  A.  Usually less than a minute.

6  Q.  So it's pretty small?

7  A.  It's very small.

8  Q.  I'm going to draw your attention to August 1st of 2021.

9  Would you have been working that day?

10  A.  Yes.

11  Q.  Do you remember you yourself picking up a cell phone from

12  the casino floor?

13  A.  Yes.

14  Q.  And after you picked up that cellular phone off of the

15  casino floor, what did you do?

16  A.  I took it up to the security man at the main entrance, and I

17  sat it down on the podium.

18  Q.  And what was your reason for picking up the cell phone?

19  A.  I found it lying on the floor, so I just picked it up, took

20  it to the podium.  There's a lost-and-found.

21  Q.  And what happened with that cell phone?

22  A.  After a period of time, a security officer took it back into

23  dispatch.

24  Q.  And what was the purpose of that?

25  A.  To log it into the lost-and-found.

ZACHARY FOLEY - DIRECT

1  Q.  And then what happened?

2  A.  The individual taking it back was trying to find information

3  on the owner and came across some pictures on the phone.

4  Q.  And was that Jon Myer (sic)?

5  A.  Yes.

6  Q.  Is Jon Myer still employed with the Prairie Flower Casino?

7  A.  No, he is not.

8  Q.  And then what happened after that?

9  A.  He came out, told me what he found.  I went back to

10  dispatch, and I proceeded to call the security manager, Bob

11  Whaling.

12  Q.  And why did you call Mr. Whaling?

13  A.  To tell him what Jon found on the phone.

14  Q.  And then what happened after that?

15  A.  I called in a review of the surveillance to try and locate

16  the owner, and then Bob called me back and told me to call

17  Carter Lake Police Department to have them look at the phone.

18  Q.  And when you say dispatch, what does dispatch look like?

19  A.  It's an employee entrance.  There's a desk.  A security

20  officer sits back there, answers phones, logs all of the calls

21  for security, makes sure people coming and going have their

22  badges on.

23  Q.  As a security manager or supervisor, what are your job

24  responsibilities while you're working?

25  A.  To ensure the safety of internal, external guests, provide

1    guest service, look for ways to increase profit, decrease

2    costs -- meaning like if I see a tear in the carpet, that could

3    be a trip hazard -- to notify the facility so we can get that

4    fixed; other than that making sure people entering the casino

5    are of age, people that are showing signs of intoxication are --

6    find a safe ride home, stuff like that.

7    Q.   Okay.  And did you end up talking to Officer Owens that

8    arrived to pick up the cellular phone that you called Carter

9    Lake Police Department about?

10   A.   I did.

11   Q.   What information did you tell Officer Owens?

12   A.   As I was walking back to dispatch, I told him we had a phone

13   and there was some explicit photos on the phone.

14   Q.   And then what did you do once you went back to dispatch?

15   A.   I handed the phone over to Officer Owens, and he went

16   through it, and he said he'll be taking it.

17   Q.   Okay.  And did you ever show Officer Owens a picture of the

18   phone -- any pictures on the phone before you handed it to him?

19   A.   No.  He's -- he opened the phone on his own.

20   Q.   And did you ever look at any of the images on the phone?

21   A.   I did.

22   Q.   And can you describe what you saw when you opened the phone?

23   A.   It appeared to be --

24            MR. MALONEY:  Objection.  Relevance.

25            THE COURT:  I'm sorry.  I didn't hear your objection.

1          MR. MALONEY:  Objection.  Relevance.

2          THE COURT:  All right.  I'm going to overrule the

3  objection.  You can go ahead and answer.

4  A.  In my opinion it appeared to be a prepubescent girl fully

5  nude.

6  Q.  And prior to employees finding the pictures that were on the

7  phone, what was the reason to -- for the officers to -- not the

8  officers.  What reason was it for the employees of the casino to

9  look into the phone?

10  A.  Normally what we do is we try and find the phone number or

11  some identifying marks so when the person comes to claim it, we

12  can make sure it's their phone and not just somebody saying,

13  Hey, I lost a phone, trying to take a phone.

14  Q.  And when you and Officer -- or excuse me -- Employee Myer

15  looked at the phone, was there any passcodes on the phone?

16  A.  There was not.

17  Q.  Now, you had previously testified that there's only one

18  entrance or exit for guests at the casino?

19  A.  Yes.

20  Q.  If -- to your knowledge when you were working that day on

21  January (sic) 1st of 2021, were you ever notified that a person

22  came in looking for a cell phone?

23  A.  No, I was not.

24  Q.  At some point did you -- were you able to identify who

25  the -- who you believed the owner of the phone was?

1    A.   Yes.

2    Q.   And was it Mr. Roberts?

3    A.   Yes.

4    Q.   And did you ever receive information from any one of the

5    other employees that Mr. Roberts had came back and was looking

6    for his cell phone?

7    A.   No.

8    Q.   Based on how the casino is set up and the instructions or

9    the rules of the casino, would you expect that if someone

10   entered the casino that you would have been notified if someone

11   was looking for that cellular phone?

12   A.   Yeah.  If someone was looking for that phone, I would have

13   been notified.

14   Q.   And in front of you, I believe, is Exhibit 5; is that

15   correct?

16   A.   Yes.

17   Q.   And you have looked at the videos on that exhibit; is that

18   true?

19   A.   Yes.

20   Q.   And does one of the videos on that exhibit show the

21   dispatcher that you talked about?

22   A.   Yes.

23   Q.   And does include when you were in there talking on the

24   phone?

25   A.   Yes.

ZACHARY FOLEY - DIRECT

1  Q.  Does it also include when Officer Owens comes to retrieve

2  the phone from you?

3  A.  Yes.

4  Q.  And is also on that exhibit video surveillance of the front

5  entrance?

6  A.  Yes.

7  Q.  And during that timeframe, it shows the cell phone going up

8  to that front dispatch and going back to -- and then leaving?

9  A.  Yes.

10  Q.  And does those two videos fairly and accurately represent

11  what your recollection was on that day?

12  A.  Yes.

13  Q.  And were you the person -- or were you aware that a

14  notification was made to surveillance to save that -- those

15  videos?

16  A.  Yes.

17          MS. SUDMANN:  I would offer Exhibit Number 5.

18          THE COURT:  Do I have that, Ms. Sudmann?

19          MS. SUDMANN:  I gave it to Vickie.

20          THE COURT:  Oh, is this it here, Vickie?

21          THE CLERK:  Yes.

22          THE COURT:  Any objection?

23          MR. MALONEY:  Judge, if I might inquire, I haven't

24  been able to review Exhibit 5 as it's been handed to me.

25          Are those the only two videos on Exhibit 5?

1    MS. SUDMANN:  Yes.

2    MR. MALONEY:  No objection to those two videos.

3    THE COURT:  All right.  It's admitted.

4    * * * Government Exhibit 5 admitted. * * *

5 Q.  And, Mr. Foley, was Mr. Roberts -- based on the

6 investigation or the incidents that happened on August 1st of

7 2021, was he flagged as being banned from the casino?

8 A.  After we identified who he was.

9 Q.  And so if he came into the casino, would you have been

10 notified of that if the ban was in effect?

11 A.  It all depends if he used the player's card or something

12 like that -- because if you look 35 or older, we're not going to

13 ID you, so you can slip through the system.

14    MS. SUDMANN:  Okay.  Perfect.  Thank you.

15    No further questions.

16    THE COURT:  Cross-exam?

17    MR. MALONEY:  Thank you, Your Honor.

18                    CROSS-EXAMINATION

19 BY MR. MALONEY:

20 Q.  Good afternoon, Mr. Foley.

21 A.  Good afternoon.

22 Q.  Sir, with regard to Exhibit 5, does that contain video

23 surveillance from the entrance that patrons come in?

24 A.  Yes.

25 Q.  And how long a period of time after the phone is discovered

1  does it show?

2  A.   I believe the phone was at the podium for an hour before it

3  was taken back to the dispatch area.

4  Q.   All right.   So after the phone is taken to the dispatch

5  area, are we still able to see the front entrance?

6  A.   I do not recall.

7  Q.   When I say front entrance, is that the entrance that patrons

8  are allowed to come through?

9  A.   Yes.   I don't know if in the video when it -- the phone is

10  taken back to dispatch -- I don't remember if the video is still

11  on the front or if it's on dispatch.

12  Q.   And with regard to the video surveillance that you have, you

13  were able to identify Mr. Roberts as the owner of the phone?

14  A.   Yes.

15  Q.   So it wasn't necessary to look through the phone itself to

16  determine who the owner was?

17  A.   After the fact we found out who the owner was.

18  Q.   Well, but, I mean, you could have -- you could have if you

19  wanted to taken that route to discover who the owner was before

20  looking in the phone; correct?

21  A.   Correct.

22  Q.   Did you personally talk to all the security officers on duty

23  on August 1st, 2021, to see if anyone had come back looking for

24  the phone?

25  A.   I have not.

1   Q.  And you're familiar with Mr. Roberts' appearance?

2   A.  At the time I was not.

3   Q.  Okay.  But after seeing video of him?

4   A.  After seeing video, yes.

5   Q.  Okay.  Would he fall into the category of a person who is

6   not going to be carded as they enter the casino?

7   A.  Correct.

8   Q.  And do people have to show their driver's license as they

9   enter the casino?

10  A.  If they look 35 or younger to the officer at the podium,

11  they do have to show ID.

12  Q.  All right.  Is there any ID that is captured from patrons

13  over 35 that come into the casino?

14  A.  On occasion but very rarely.

15          MR. MALONEY:  No further questions, Your Honor.

16          THE COURT:  Anything further, Ms. Sudmann?

17          MS. SUDMANN:  No, Your Honor.

18          THE COURT:  All right.  You can step down, sir.  Thank

19  you.

20          THE WITNESS:  Thank you.

21          THE COURT:  Does the Government have any other

22  witness?

23          MS. SUDMANN:  No, Your Honor.

24          THE COURT:  All right.

25          Mr. Maloney, any evidence you want to present?

1          MR. MALONEY:  Yes, Your Honor.  Your Honor, I have two

2   witnesses.  Both will be relatively brief.

3          THE COURT:  Okay.

4          MR. MALONEY:  By brief, I mean about five minutes.

5          THE COURT:  Go ahead and call your first one.

6          MR. MALONEY:  Thank you, Your Honor.  I would call

7   Christina Roberts.

8          THE COURT:  All right.

9          MR. MALONEY:  May I leave the courtroom to secure --

10          THE COURT:  You certainly can.

11          Come on up here, Ms. Roberts, and my courtroom deputy

12   is going to put you under oath.

13          THE CLERK:  Please raise your right hand.

14           CHRISTINA ROBERTS, DEFENSE WITNESS, SWORN

15          THE CLERK:  Thank you.  If you want to take a seat

16   right over here.

17          MR. MALONEY:  Thank you, Your Honor.

18                        DIRECT-EXAMINATION

19   BY MR. MALONEY:

20   Q.  Good afternoon, Ms. Roberts.

21   A.  Hi.

22   Q.  Could you please state your name, spelling your first and

23   last names for the record.

24   A.  Christina Roberts, C-h-r-i-s-t-i-n-a R-o-b-e-r-t-s.

25   Q.  Are you related to Ernest Roberts?

46

1  A.  Yes.  He's my brother.

2  Q.  Do you see him seated here in the courtroom?

3  A.  Yes.

4  Q.  Did you and Mr. Roberts go to the Prairie Flower Casino in

5  Carter Lake, Iowa, on August 1st of 2021?

6  A.  Yes.

7  Q.  How did you get there?

8  A.  I drove.

9  Q.  Do you recall how long you stayed at the casino?

10  A.  Not exactly.

11  Q.  Were you -- who all went to the casino that day in your car?

12  A.  It was me, my brother, and a family friend of ours, Gerry.

13  Q.  What's his last name?

14  A.  Savicky.

15       THE COURT:  Could you spell that for us?  Can you

16  spell that last name for us.

17       THE WITNESS:  S-a-v-i-c-k-y, I believe.

18       THE COURT:  Okay.  Thank you.

19       Go ahead, Mr. Maloney.

20       MR. MALONEY:  Thank you, Your Honor.

21  Q.  Did all three of you stay together at the casino, or did you

22  split up?

23  A.  We split up.

24  Q.  Okay.  And how long do you recall staying at the casino?

25  A.  I really couldn't tell you.  I do not remember how long we

1  were there.

2  Q.  Did all three of you leave together?

3  A.  Yes.

4  Q.  Did something happen on the way home that caused you to

5  return to the casino?

6  A.  Yes.  We were almost there, and my brother started looking

7  for his phone, said he couldn't find it, and I said, Do you want

8  to go back?  And he said, Yes, so I turned around.

9  Q.  When you say almost there --

10 A.  Well, almost home.

11 Q.  All right.  And about how long of a round trip would you say

12 that was from leaving the casino and returning?

13 A.  Exactly I don't know.  I'd say 20, 25 minutes maybe, but I

14 say that probably for everything.

15 Q.  Okay.  Did you yourself go back into the casino?

16 A.  I believe so, yes, because I do recall walking toward where

17 my brother was gambling before we left and looking around for

18 his phone.

19 Q.  How long do you estimate that you stayed back in the casino

20 before you left a second time?

21 A.  It wasn't but just a couple of minutes probably.

22         MR. MALONEY:  Okay.  No further questions, Your Honor.

23         THE COURT:  Any cross-examination?

24         MS. SUDMANN:  Yes, Your Honor.

25         THE COURT:  Okay.

48

1                        CROSS-EXAMINATION

2    BY MS. SUDMANN:

3    Q.  Good morning.

4    A.  Hello.

5    Q.  Do you remember what timeframe you were at the casino -- not

6    specific but, like, from what time to what time approximately?

7    A.  I know it was in the early afternoon.  I don't -- I do not

8    remember what time it was exactly, no.

9    Q.  Do you remember what time you went back?  Like,

10   approximately what time you went back to go look for the cell

11   phone?

12   A.  No.  I know from the time we left, we didn't make it back to

13   where we lived before I turned around, so it wasn't terribly

14   long.  I don't know, though.

15   Q.  And you remember going back in with your brother.  Did

16   anyone else go in to look for the phone with the two of you?

17   A.  Gerry would have came in with us.

18   Q.  So there were three of you looking?

19   A.  Yeah.

20   Q.  Did you ask anyone if they had found a phone?

21   A.  I didn't.  I know my brother left me and Gerry.  He said he

22   walked up to ask if they had his phone.  They told him no, so

23   when he came back and said they said they didn't have it, we

24   left.

25   Q.  And when you walk into the casino, is there some sort of,

1   like, a -- a podium or a --

2   A.   Yeah.   There's the security guard right there.

3   Q.   When you walk in?

4   A.   Yeah.

5   Q.   And you were only there back at the casino for a couple

6   minutes?

7   A.   Yeah.

8   Q.   And then after that was there any additional efforts made to

9   try and locate the phone?

10  A.   I -- I do believe I tried calling his phone.  Gerry said the

11  same thing.  He thought he recalled calling his phone.  Nobody

12  answered.  And I remember -- that's probably about it.  I asked

13  him maybe the next day if he had ever found it.

14              MS. SUDMANN:  Thank you.

15              THE COURT:  Anything further, Mr. Maloney?

16              MR. MALONEY:  Not from this witness, Your Honor.

17              THE COURT:  All right.  You can step down, ma'am.

18              THE WITNESS:  Thank you.

19              THE COURT:  And you can call your next witness,

20  Mr. Maloney.

21              MR. MALONEY:  Thank you, Your Honor.  The defense

22  would call Gerald Savicky.  May I secure the witness, Your

23  Honor?

24              THE COURT:  You may.

25              Come on straight up here, sir, and my courtroom deputy

50

1    is going to place you under oath.

2              THE CLERK:  Please raise your right hand.

3                GERALD SAVICKY, DEFENSE WITNESS, SWORN

4              THE CLERK:  Thank you.  You may walk over there and

5    take a seat right up there.  Thank you.

6              MR. MALONEY:  May I proceed, Your Honor?

7              THE COURT:  Yes, you may.

8              MR. MALONEY:  Thank you.

9                          DIRECT EXAMINATION

10   BY MR. MALONEY:

11   Q.  Good afternoon, Mr. Savicky.  Could you please state your

12   name, spelling your first and last name for the record.

13   A.  It's G-e-r-a-l-d, Gerald; S-a-v-i-c-k-y, Savicky.

14   Q.  Mr. Savicky, are you familiar with an Ernest Roberts?

15   A.  Yep.

16   Q.  How do you know Mr. Roberts?

17   A.  We used to work together.  I've known him for 35 years now.

18   Q.  Very well.  Do you recall on August 1st of 2021 going to the

19   Prairie Flower Casino in Carter Lake, Iowa?

20   A.  Yep.

21   Q.  Who were you -- who did you go to the casino with that day?

22   A.  Ray and his sister.

23   Q.  His sister's name?

24   A.  Christina Roberts.

25   Q.  All right.  And you refer to him as Ray.  Ernest?

51

1  A.  Ray, yeah.

2  Q.  That's how you refer to him?

3  A.  Yeah.  He goes by Ray more than Ernest.

4  Q.  All right.  Do you recall how long the three of you stayed

5  at the casino?

6  A.  I'm going to guess maybe an hour and a half.

7  Q.  And how did you all get to the casino?

8  A.  Christina drove.

9  Q.  Did you all three leave the casino together?

10  A.  Yep.

11  Q.  Did Ms. Roberts drive all of you -- the three of you home?

12  A.  Yeah.

13  Q.  Did you make it home, or did you return to the casino?

14  A.  We had to return to the casino because Ray couldn't find his

15  phone.

16  Q.  Did you return with them?

17  A.  Yeah.

18  Q.  Did you go back into the casino?

19  A.  Yep.  We all looked for his phone.

20  Q.  Do you recall how long you were looking for his phone?

21  A.  Maybe 20 minutes, half hour.  I'm guessing now.

22  Q.  Did you observe at any time Mr. Roberts talk to a security

23  guard about whether anyone had found his phone?

24  A.  Yeah, towards the end.

25  Q.  And did you overhear that conversation at all?

GERALD SAVICKY - CROSS

52

1   A.   Yeah.   They said that they didn't have it.

2   Q.   Okay.   And then did the three of you leave shortly

3   thereafter?

4   A.   I believe so.

5          MR. MALONEY:   No further questions, Your Honor.

6          THE COURT:   Cross-examination?

7          MS. SUDMANN:   Thank you.

8                        CROSS-EXAMINATION

9   BY MS. SUDMANN:

10  Q.   Mr. Savicky, do you recall what time you went to the casino

11  that day?

12  A.   It was late afternoon, early evening to my recollection.

13  Q.   Do you have a player's card for that facility?

14  A.   I think I got one when we went to -- I got one that day.

15  Q.   Did you use it that day?

16  A.   Yeah.

17  Q.   And then when you left the casino, do you remember about

18  what the timeframe was before you returned?

19  A.   It was -- it was about 20 minutes from leaving to coming

20  back.

21  Q.   And when you came back to the casino, did you enter the same

22  way that you exited when you left?

23  A.   Yeah.   I think there's only one entrance, isn't there?   Yes.

24  Q.   And when you first walked in to the casino, do you recall if

25  anyone asked the person that was standing there, an employee, if

1   they found a phone?

2   A.   I think somebody must have.  It wouldn't have been me,

3   though.  I just went -- went off to -- I asked him where he was

4   playing, and I started looking for it.  And I was calling it the

5   whole time on the way back from when he said he couldn't find

6   it.  I was calling it the whole time going back to the casino

7   too.

8           MS. SUDMANN:  Thank you.  No further questions.

9           THE COURT:  Mr. Maloney?

10          MR. MALONEY:  No further questions, Your Honor.

11          THE COURT:  All right.  Mr. Savicky, just one question

12   for the record.

13          Can you describe for me what a player's card is?

14          THE WITNESS:  It's a plastic card you'd put in the

15   machine to count your time there or whatever.

16          THE COURT:  And what -- what's the purpose of it?  I

17   mean, why do you want one of those?

18          THE WITNESS:  A lot of times you can get rewards

19   through them.

20          THE COURT:  Okay.  All right.  Does it have money on

21   it, or do you still have to put money into the machine?

22          THE WITNESS:  You still have to put money into the

23   machine, but sometimes you can get rewards through it and get

24   credits, I believe.

25          THE COURT:  Okay.  It just calculates -- keeps track

54

1 of how long you were playing and that type of thing?

2        THE WITNESS:  Yeah.  I mean, it's more of their

3 marketing of you in the machines.

4        THE COURT:  Does it cost you anything?

5        THE WITNESS:  No.

6        THE COURT:  Okay.  All right.  Thank you.  You can

7 step down.

8        THE WITNESS:  Thanks.

9        THE COURT:  You're welcome.

10        Any other evidence, Mr. Maloney?

11        MR. MALONEY:  No other evidence, Your Honor.

12        Your Honor, I would ask -- and I hate to ask this

13 again, but I haven't had a chance to review Exhibit 5.  If the

14 Court could hold the record open until, say, Wednesday in case I

15 have anything to supplement in response to that?

16        THE COURT:  That's fine.  I'll do that.  I need to do

17 a ruling out for Judge Ebinger -- I've got to do a report and

18 recommendation, but I'll hold it open for Wednesday.

19        Question for both of you.  I assume I do not have an

20 exhibit that has -- shows what the picture was that the casino

21 employees saw when they opened up the phone; is that correct?

22        MS. SUDMANN:  That is correct, because they didn't

23 take a picture of it.

24        THE COURT:  There is not -- we don't know what that is

25 then, I take it.

1          MS. SUDMANN:  The Government hasn't looked at the

2    phone to try and find the picture.  Certainly that could be done

3    if the record -- between now and Wednesday.

4          THE COURT:  Yeah.  I mean, it would be helpful to me

5    if I could actually know what the picture was that was

6    supposedly seen by the casino employees because my understanding

7    is -- unless you guys have a different understanding is that it

8    was a picture that was seen by the casino employees, and that's

9    what was told to the police officer when he came.  There was a

10   description given of a picture that was seen.  Am I incorrect in

11   that regard?

12         MS. SUDMANN:  No.  That's fair, Your Honor.

13         MR. MALONEY:  Judge, my recollection is that the

14   officer testified that the information imparted to him he

15   included in the affidavit, and the affidavit described the

16   picture that the officer saw as partially -- I don't want to say

17   because I don't have the description in front of me, but on

18   cross-exam he indicated that the photo that he observed was

19   blurry, that it did not involve any nudity below the waist nor

20   any focus on the genital area.

21         THE COURT:  All right.  And so it sounds like there's

22   a possibility that there might have been two different pictures

23   looked at then, the one by Mr. Myer, which as I

24   think Mr. Maloney has kind of described, I think it was

25   described as a scantily clad young female, and then Mr. Foley

1   testified that the picture he saw was of a fully nude young

2   female, so it sounds like there could have been two different

3   pictures looked at depending on whether it was Mr. Myer or

4   Mr. Foley who looked at the picture; is that correct?

5            MS. SUDMANN:  It could be, and there's a lot of

6   pictures on this device.

7            THE COURT:  Okay.  All right.

8            MR. MALONEY:  Yeah.  I don't think there's any

9   question that the testimony is describing two different

10  photographs.

11           THE COURT:  Okay.  That's -- that was kind of my

12  impression just based upon what the officer said.

13           So, Ms. Sudmann, if you can produce to the Court those

14  pictures, the one that Mr. Myer would have seen that was

15  presented to the officer and then the one that Mr. Foley has

16  described here, that would be helpful.  If you can't get them by

17  Wednesday, then you can't, but if you can, just go ahead, and

18  you can produce them as exhibits.  I'll obviously put them under

19  seal, or you can produce them to me in camera if you both agree

20  to that.  That's fine as well.

21           MS. SUDMANN:  Yes, Your Honor.

22           And the Government did file a supplemental motion

23  today that talks about the -- not a supplemental motion --

24  supplemental authority that differentiates what Iowa code law is

25  for child pornography and what federal code is, and they are

57

1  different.

2          THE COURT:  Okay.

3          MS. SUDMANN:  So I did provide that additional

4  information based on Mr. Maloney's supplemental authority he

5  presented -- he submitted.

6          THE COURT:  All right.  And I do have your briefs that

7  you guys have both submitted too.

8          Do either of you want to make any further argument

9  today?

10         Ms. Sudmann?

11         MS. SUDMANN:  Are you planning to make argument today?

12         MR. MALONEY:  No.  I'll submit if you submit.

13         MS. SUDMANN:  We'll submit -- we'll submit, Your

14  Honor.  I think you know -- I mean, I think our supplemental

15  authority kind of explains all the areas where the Court can go

16  to from both sides.

17         THE COURT:  Okay.

18         MR. MALONEY:  And, Judge, just so I don't get in

19  trouble with my appellate attorneys, can I pose an objection to

20  the Court receiving the photograph that was described here today

21  by Mr. Foley?  And the reason for that objection is the officer

22  didn't give any indication in his testimony that Mr. Foley had

23  shown that picture to him.

24         THE COURT:  You can -- you can certainly pose your

25  objection.  It's on the record.  I'm going to overrule it.  I

1  still want to see the photograph.  I understand that it may --

2  that the weight that I give it may be something different, but I

3  do want to have access to it given that the witness has

4  testified to it.

5            Okay.  Anything further?

6            MS. SUDMANN:  Oh, yes.  I inadvertently said 2022 --

7  August 1st of 2022, but this incident happened on August 1st of

8  2021 -- when I was questioning Mr. Foley, so I would just like

9  to -- that was my error.

10           THE COURT:  Oh, okay.  I thought you said 2021.

11           MS. SUDMANN:  Maybe I did.

12           THE COURT:  But I -- you can certainly -- the record

13  is correct to that extent.  I know that the incident occurred in

14  August of 2021.

15           MR. MALONEY:  Judge, one final thing.  Today is our

16  plea entry deadline --

17           THE COURT:  Uh-huh.

18           MR. MALONEY:  -- so I don't know -- we would ask the

19  Court to continue the trial for 30 days and push back all

20  associated deadlines to accommodate the necessary time that the

21  Court's going to need to make a ruling.

22           THE COURT:  Will you file a motion on Monday on that?

23           MR. MALONEY:  Yes.

24           THE COURT:  I will -- and just indicate that you

25  raised it today and that I asked you to file a motion.  I'm

1  going to have to have a conversation with Judge Ebinger's

2  chambers to see when -- A, if she has any objection to that.  I

3  don't know that she will but then when she would want to reset

4  it because I don't know what her calendar looks like; okay?

5          MS. SUDMANN:  Yes, Your Honor.

6          THE COURT:  And you can just note, like I said, that

7  you raised it today and that I asked you to file the motion?

8          MR. MALONEY:  Will do, Your Honor.

9          THE COURT:  Okay.  Anything else?

10          MS. SUDMANN:  No.

11          THE COURT:  All right.  We're in recess.

12          (Proceedings concluded at 12:07 p.m.)

13

14                  C E R T I F I C A T E
         I, Tonya R. Gerke, a Certified Shorthand Reporter of
15  the State of Iowa and Federal Official Realtime Court Reporter
   in and for the United States District Court for the Southern
16  District of Iowa, do hereby certify, pursuant to Title 28 U.S.C.
   Section 753, that the foregoing is a true and correct transcript
17  of the stenographically reported proceedings held in the
   above-entitled matter and that the transcript page format is in
18  conformance with the regulations of the Judicial Conference of
   the United States.
19          Dated at Des Moines, Iowa, August 16, 2023.

20

21                  /s/ Tonya R. Gerke
                  Tonya R. Gerke, CSR, RDR, CRR
22                  Federal Official Court Reporter

23

24

25

```
 1                          INDEX

 2   WITNESS                                      PAGE

 3       ZACHARY FOLEY, GOVERNMENT WITNESS          34

 4    DIRECT EXAMINATION BY MS. SUDMANN             35

 5    CROSS-EXAMINATION BY MR. MALONEY              42

 6       CHRISTINA ROBERTS, DEFENSE WITNESS         45

 7    DIRECT-EXAMINATION BY MR. MALONEY             45

 8    CROSS-EXAMINATION BY MS. SUDMANN              48

 9       GERALD SAVICKY, DEFENSE WITNESS            50

10    DIRECT EXAMINATION BY MR. MALONEY             50

11    CROSS-EXAMINATION BY MS. SUDMANN              52

12   EXHIBIT                                      PAGE

13    Government Exhibit 5                          42

14

15

16

17

18

19

20

21

22

23

24

25
```